Slip Op. 09-44

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SOUTHERN SHRIMP ALLIANCE, JOHN WILLIAMS, VERSAGGI SHRIMP CORPORATION, ROBERT KNIGHT, OCEAN BREEZE INC., MASTER MIKE INC., GULF RUNNER INC., WALLACE B. INC., GULF RUNNER INC., WALLACE B INC., DOCTOR BILL INC., MASTER ALSTON INC., MISS KELSEY INC., AND LADY GWEN DOE INC., | Before: Gregory W. Carman, Judge Timothy C. Stanceu, Judge Leo M. Gordon, Judge |

Before: Gregory W. Carman, Judge
Timothy C. Stanceu, Judge
Leo M. Gordon, Judge

Court No. 08-00394

SOUTHERN SHRIMP ALLIANCE, JOHN WILLIAMS, VERSAGGI SHRIMP CORPORATION, ROBERT KNIGHT, OCEAN BREEZE INC., MASTER MIKE INC., GULF RUNNER INC., WALLACE B. INC., GULF RUNNER INC., WALLACE B INC., DOCTOR BILL INC., MASTER ALSTON INC., MISS KELSEY INC., AND LADY GWEN DOE INC.,

Plaintiffs,

v.

UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, AND W. RALPH BASHAM, COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION,

Defendants,

and

AMERICAN SHRIMP PROCESSORS ASSOCIATION AND ITS MEMBERS,

Defendant-Intervenors.

**OPINION AND ORDER**

[Defendants' motion to dismiss granted; Defendant-Intervenors' motion to dismiss granted in part and denied in part.]

Dated: May 15, 2009

Dewey & LeBouef, LLP (Bradford L. Ward, Andrew W. Kentz, David A. Bentley, Lisa W. Wang, Nathaniel M. Rickard) for Plaintiffs.

Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael J. Dierberg, Trial Attorney) for Defendants United States.

Stewart and Stewart, (Geert M. De Prest, Elizabeth J. Drake) for Defendant-Intervenors.

Leake & Anderson, LLC, (Edward T. Hayes) for Defendant-Intervenors.

**Per Curiam:** In this action, Plaintiffs bring various challenges to the administration by U.S. Customs and Border Protection ("Customs") of the Continued Dumping and Subsidy Offset Act, Section 754 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675c (2000)[1] ("CDSOA"), repealed by the Deficit Reduction Act of 2005, Pub. L. No. 109-171, Title VII, Subtitle F § 7601(a), 120 Stat. 154 ("CDSOA Repeal").  Before the court are Defendants' motion to dismiss all but one of the claims in Plaintiffs' First Amended and Supplemented Complaint ("Complaint" or "Compl."), and Defendant-Intervenors' motion to dismiss Plaintiffs' Complaint in its entirety; both motions are made pursuant to USCIT Rules 12(b)(1) and 12(b)(5).  In the Complaint, Plaintiffs allege "improper actions," (Compl. ¶ 18), "inadequate administration," (id. ¶ 21), and "wrongful policies and procedures," (id. ¶ 23), relating to the CDSOA.  Defendants and Defendant-Intervenors attack the sufficiency of Plaintiffs' claims that contest Customs' interpretation and application of the CDSOA and its regulations, including a constitutional claim that Plaintiffs bring with respect to reconsideration proceedings conducted under the CDSOA.  Defendants and Defendant-Intervenors also argue that certain of Plaintiffs' claims are not justiciable under the

---

[1]Further citations to the Tariff Act of 1930 are to the relevant provisions in Title 19 of the U.S. Code, 2000 edition.

Administrative Procedure Act ("APA").   The court exercises jurisdiction pursuant to

28 U.S.C. § 1581(i)(2) and (4) (2000), except to the extent noted in the discussion

pertaining to Count 1 of the Complaint, in which Plaintiffs seek judicial review of agency

action that is committed to Customs' discretion by law.   For the reasons set forth below, the

court grants Defendants' motion to dismiss and grants Defendant-Intervenors' motion to

dismiss, except that the court denies Defendant-Intervenors' motion with respect to the sole

claim that Defendants do not move to dismiss; that claim is presented in Count 8 of the

Complaint and arises under 19 U.S.C. § 1625(a).

## I. Background

In 2000, Congress amended Title VII of the Tariff Act of 1930 with the passage of

the CDSOA, more popularly known as the Byrd Amendment.   The CDSOA, although

repealed in February 2006, continues to apply to antidumping and countervailing duties

collected on entries made and filed prior to October 1, 2007.   See CDSOA Repeal.

Intended to strengthen the remedial purposes of the antidumping and countervailing duty

laws,[2] the CDSOA altered the use of proceeds from antidumping and countervailing

---

[2]In adopting the Byrd Amendment, Congress made the following specific findings:

(1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.

(2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.

(3) The continued dumping or subsidization of imported

(continued...)

duties. Prior to the CDSOA, Customs deposited antidumping and countervailing duties into the U.S. Treasury to be used for general government expenses. Pursuant to the CDSOA, however, Customs deposits antidumping and countervailing duties into special U.S. Treasury accounts for each antidumping and countervailing duty order. 19 U.S.C. § 1675c(e); 19 C.F.R. § 159.64 (2006). The monies in those special accounts are then distributed by Customs, annually, on a pro rata basis to "affected domestic producers" ("ADPs") for their "qualifying expenditures," (or "qualified expenditures,") i.e., certain enumerated business expenses such as manufacturing facilities, equipment, raw materials, and working capital or other funds needed to maintain production. 19 U.S.C. § 1675c(b)(4), (d)(2)-(3).

The CDSOA directs Customs to "prescribe procedures for the distribution" of CDSOA funds, 19 U.S.C. § 1675c(c), as well as to prescribe, by regulation, the time and

---

[2](...continued)
>     products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.
>
>     (4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.
>
>     (5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.

Continued Dumping and Subsidy Offset Act of 2000, Pub.L. No. 106-387, § 1(a), § 1002, 114 Stat. 1549, 1549A-72 (2000).

manner of that distribution.  19 U.S.C. § 1675c(e)(3).  Under the CDSOA, the United States

International Trade Commission ("ITC") compiles and forwards to Customs a list of ADPs

for each antidumping duty order in effect.  Id. § 1675c(d)(1).  An ADP is any "manufacturer,

producer, farmer, rancher, or worker representative (including associations of such

persons) that (A) was a petitioner or interested party in support of the petition with respect

to which an antidumping duty order . . . has been entered, and (B) remains in operation."

Id. § 1675c(d)(1); 19 C.F.R. § 159.61(b).

Using the ITC's list of ADPs, Customs publishes a notice of intent to distribute

CDSOA funds along with the list of ADPs potentially eligible for a distribution.  19 U.S.C.

§ 1675c(d)(2); 19 C.F.R. § 159.62(a).  Customs' notice invites potentially eligible ADPs to

submit certifications that the ADPs are eligible for a distribution.  19 U.S.C. § 1675c(d)(2);

19 C.F.R. § 159.63.  Id.  Although the CDSOA requires that Customs request a certification

from each potentially eligible ADP, the regulations do not prescribe an exact format for that

certification.    Rather, the regulations require that a certification include identifying

information regarding the domestic producer, a calculation of the amount of the distribution

being claimed, a statement of eligibility for CDSOA funds, and an enumeration of qualifying

expenditures incurred for which a distribution has not been made previously.  19 C.F.R.

§ 159.63(a)-(b).  Additionally, the regulations set forth procedures for the review, correction,

and verification of a certification.  § 159.63(c)-(d).

Customs must distribute all CDSOA funds no later than 60 days after the first day

of the fiscal year from duties assessed during the preceding fiscal year, 19 U.S.C.

§ 1675c(c), and on a pro rata basis from the certifications submitted by the ADPs,

19 U.S.C. § 1675c(d)(3); 19 C.F.R. § 159.64.  The regulations provide a process for the distribution of refunds of CDSOA funds recovered as a result of a reliquidation or court action affecting the underlying entries, and for the collection of overpayments made to ADPs; the regulations include a statement that Customs is to use "all available methods" in the collection of those overpayments.   19 C.F.R. § 159.64(b)(2)-(3).   Lastly, the regulations set forth different methods for distribution depending on whether the total amount of the certified claims do or do not exceed the amount of available CDSOA funds. Id. § 159.64(c)(1)-(2).  Where a distribution is for less than the full amount of the certified claim, an ADP may request reconsideration based on a belief that the distribution was made due to a clerical error or mistake.  Id. § 159.64(c)(3).

Plaintiffs are an association of domestic processors and harvesters of warmwater shrimp in eight coastal states from North Carolina to Texas (Southern Shrimp Alliance ("SSA")), and individual shrimp fishermen and corporate entities engaged in the harvesting and sale of warmwater shrimp.  (Compl. ¶ 1.)  Customs has distributed CDSOA funds for fiscal years 2006 and 2007, and has noticed its intent to distribute funds for fiscal year 2008.  (Id. ¶¶ 26, 28, 35.)  Plaintiffs' Complaint challenges Customs' distribution of CDSOA funds from antidumping duties collected from the antidumping orders on certain frozen warmwater shrimp from Brazil, China, Ecuador, India, Thailand, and Vietnam during fiscal years 2006, 2007, and 2008.  Plaintiffs' Complaint involves a broad-based challenge to Customs' allegedly improper administration of the CDSOA, which, according to Plaintiffs, resulted in lower distributions to Plaintiffs for various reasons.

## II. Discussion

In deciding a USCIT Rule 12(b)(1) motion to dismiss that does not challenge the factual basis for the complainant's allegations, and when deciding a USCIT Rule 12(b)(5) motion to dismiss for failure to state a claim upon which relief can be granted, the court assumes all factual allegations to be true and draws all reasonable inferences in plaintiff's favor.  See Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84 & n.13 (Fed. Cir. 1993); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (subject matter jurisdiction); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (failure to state a claim).

The applicable pleading requirements for Plaintiffs' claims are set forth in USCIT Rule 8(a), which provides that a complaint shall contain "a short and plain statement of the claim" showing that the plaintiff is entitled to relief.  USCIT R. 8(a) (2008).  Rule 8(a) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) ("Bell Atlantic") (citation omitted).  Although a complaint need not contain detailed factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  The Court of Appeals for the Federal Circuit has held that to avoid a dismissal for failure to state a claim under Bell Atlantic, "a plaintiff must plead factual allegations that support a facially 'plausible' claim to relief."  Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009).  The Second Circuit Court of Appeals has interpreted Bell Atlantic as "requiring a flexible 'plausibility standard,'

which obliges a pleader to amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d

143, 157-58 (2d Cir. 2007) (emphasis omitted).  As the Third Circuit Court of Appeals has

explained, "there must be some showing sufficient to justify moving the case beyond the

pleadings to the next stage of litigation." Phillips v. County of Allegheny, 515 F.3d 224,

234-35 (3d Cir. 2008).

The Complaint sets forth eleven counts.  Below, after summarizing briefly the claims

made in each of these counts, the court presents its reasons for concluding that all claims

in the Complaint must be dismissed, with the exception of Plaintiffs' claim arising under

19 U.S.C. § 1625(a) found in Count 8.  Because the court concludes that some of the

counts overlap with respect to particular claims, and because certain threshold issues affect

the analysis, the court does not present its decisions with respect to the eleven counts in

the order in which they appear in the Complaint.

Count 1 (Compl. ¶¶ 103-11) claims that Customs has "fail[ed] to administer the

CDSOA program so as to distribute funds derived from duties collected . . . for the benefit

of affected domestic producers based on incurred qualifying expenditures related to

domestic production." (Id. ¶ 111.)  More specifically, Plaintiffs claim that Customs knew or

should have known that deceptive certifications for CDSOA funds were submitted despite

the "absurdity, impropriety, or obvious error" contained in those certifications.  (Id. ¶ 107.)

Thus, according to Plaintiffs, Customs calculated and assigned pro rata shares resulting

"in a significant loss of revenue" for Plaintiffs.  (Id. ¶¶ 107, 109.)  According to Plaintiffs,

Customs' administration of the program has "resulted in a significant loss of revenue" for Plaintiffs.  (Id. ¶ 109.)

Count 2 (id. ¶¶ 112-117) claims that Customs unlawfully has "fail[ed] to prescribe procedures sufficient and necessary to ensure that CDSOA distributions were made to claimants for qualifying expenditures related to domestic production as required by law" and as specifically required by 19 U.S.C. § 1675c and 19 C.F.R. §§ 159.61-64.  (Id. ¶¶ 113, 116.)  Plaintiffs claim that they must be granted relief as required by the APA and the Mandamus Act, 28 U.S.C. § 1361 (2000), under which the court must compel Customs to prescribe the necessary procedures as performance of a legal duty owed to Plaintiffs. (Id. ¶ 117.)

Counts 3 through 6 relate to allegations by Plaintiffs that Customs has unlawfully calculated CDSOA distributions based on ADP certifications that contain expenditures that are not "qualifying expenditures" under the CDSOA. (Id. ¶¶ 118-47.)   Count 3 (id. ¶¶ 118-128) claims that Customs has unlawfully "fail[ed] to promulgate standards or guidelines, or otherwise enforce the agency's regulations requiring that qualifying expenditures must be related to the production of shrimp." (Id. ¶¶ 120, 128.) Count 4 (id. ¶¶ 129-35) alleges that Customs unlawfully allows ADP shrimp processors to "double count" qualified expenditures.  (Id. ¶¶ 131, 132.)  Plaintiffs also complain therein that in calculating CDSOA distributions Customs ignores a purported domestic production requirement contained in the agency's regulations.  (Id. ¶ 133.)  Count 5 (id. ¶¶ 136-40) alleges that Customs unlawfully permitted ADP shrimp processors to claim as a qualified expenditure the purchase cost of imported shrimp. (Id. ¶¶ 138-40.) Count 6 (id. ¶¶ 141-47)

alleges that Customs unlawfully permitted ADP shrimp processors to claim as a qualified expenditure antidumping duties paid on imported shrimp.  (Id. ¶¶ 143-47.)

Count 7 (id. ¶¶ 148-55) claims that Customs violated Plaintiffs' constitutional rights by unlawfully prohibiting Plaintiffs' participation in the agency's administrative process directed to the reconsideration of CDSOA distributions.

Count 8 (id. ¶¶ 156-63) claims that Customs unlawfully conducted its administrative process regarding reconsideration of CDSOA distributions without publishing procedures, rules, or guidelines as to the conduct of such proceedings, as required by the Freedom of Information Act, 5 U.S.C. § 552 (2000)[3], and without publishing rulings resulting from those proceedings, as required by 19 U.S.C. § 1625.

Count 9 (id. ¶¶ 164-67) claims that Customs acted unlawfully when, in response to pending litigation on the constitutionality of the CDSOA, Customs escrowed, rather than distributed, a portion of the CDSOA funds for fiscal years 2006, 2007, and 2008.  Plaintiffs claim Customs had no legal justification for withholding CDSOA funds from "deserving" ADPs, including Plaintiffs, for the benefit of litigants who do not meet the CDSOA definition of "affected domestic producers."  (Id.)

Count 10 (id. ¶¶ 168-72) claims that Customs unlawfully distributed funds collected from CDSOA overpayments in accordance with the pro rata calculation for the fiscal year in which the overpayments were recovered, rather than the pro rata calculation for the fiscal year in which antidumping duties were originally collected.  Plaintiffs allege this practice to be inconsistent with 19 U.S.C. § 1675c(d)(3).  (Id. ¶ 170.)

---

[3]Further citations to Title 5 of the U.S. Code refer to the 2000 edition.

Finally, Count 11 (id. ¶¶ 173-81) claims that subsequent to the repeal of the CDSOA, Customs unlawfully decided that CDSOA offsets for duties from the antidumping orders on shrimp may only be claimed for qualified expenditures incurred before October 1, 2007. According to Plaintiffs, Customs' exclusion of qualifying expenditures incurred after October 1, 2007 has no basis in law.  (Id. ¶ 178.)  Plaintiffs further allege that Customs' decision to this effect was unlawful because Customs failed to provide for notice and comment by Plaintiffs and other interested persons.  (Id. ¶¶ 180-81 (citing 5 U.S.C. § 553 and 19 U.S.C. § 1625).)

## A. Claims Pertaining to the Nature of Qualifying Expenditures (Counts 3-6)

The court begins by addressing the claims in Counts 3 through 6, which relate to allegations by Plaintiffs that Customs has unlawfully calculated CDSOA distributions based on ADP certifications that contain expenditures that are not "qualifying expenditures" under the CDSOA. (Compl. ¶¶ 118-47.) In moving to dismiss these counts, Defendants and Defendant-Intervenors argue that Plaintiffs' Complaint relies on an incorrect interpretation of both the CDSOA and 19 C.F.R. § 159.61(c).

## 1. Acquisition of Shrimp (Count 5)

In Count 5, Plaintiffs challenge Customs' acceptance of imported shrimp as a qualified expenditure for raw materials.  (Compl. ¶¶ 136-40.)  Plaintiffs claim that distributing CDSOA funds for the cost of imported shrimp frustrates the remedial purpose of the CDSOA by subsidizing the purchase of foreign produced shrimp to the detriment of ADP shrimp farmers. (Id. ¶¶ 138-39.)  Plaintiffs insist that the raw materials provision must be construed to exclude the cost of acquiring imported shrimp.  (Id. ¶¶ 139-40.)

We begin with the plain language of the CDSOA, which states that a qualifying expenditure is "an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories: . . . (I) Acquisition of raw materials and other inputs."  19 U.S.C. § 1675c(b)(4).  Customs interpreted this provision in 2003, when it issued a ruling letter rejecting an interpretation of § 1675c(b) virtually identical to the interpretation urged by Plaintiffs in this action.  See Customs Ruling Letter HQ 230112 (Dec. 16, 2003) ("Honey Ruling").   In the Honey Ruling, trade associations representing ADP beekeepers and ADP beekeeper packers requested a ruling from Customs holding that ADP independent packers (who did not engage in beekeeping operations, but who purchased, processed, packaged, and marketed raw domestic and foreign honey) were precluded from claiming the cost of purchasing domestic or foreign honey as a qualified expenditure under § 1675c(b)(4)(I).  Id.

In rejecting the request, Customs explained that "the plain language of 1675c(b)(4) does not distinguish between a domestic or foreign expenditure, . . . [or] require that an acquisition under 1675c(b)(4)(I) be of domestic raw materials or other inputs."  Id.  Customs also explained that the CDSOA does not contemplate disparate treatment of ADPs:

> [The] domestic industry found by the ITC for purposes of determining standing included both beekeepers and packers and the inputs included for that industry included several categories of honey . . . .  Thus, packers are producers of honey within the meaning of the antidumping order and therefore, may claim as a qualifying expenditure, the honey they acquire to make creamed, colored, and flavored honeys.

Id.  Customs  acknowledged the ITC's primary role in determining who qualifies as an ADP through its definition of the domestic industry.  In so doing, Customs appears to have

recognized that the disparate treatment of ADPs advocated by the petitioners in the Honey Ruling effectively would invite Customs to redefine the domestic industry by limiting an ADP's right to claim certain expenses as a qualified expenditure.

In 2007, Plaintiffs asked Customs to consider the same issues as were addressed in the Honey Ruling.  In response, Customs observed that "[s]hrimp, in its natural state, is a 'raw material'" and "to the extent that shrimp purchases are related to the production of the same product that is the subject of the order . . . the purchase of shrimp may be considered a qualified expenditure under [the statute]."  See Letter from William G. Rosoff, Chief, Entry Process and Duty Refunds Branch, to Bradford L. Ward, Dewey Ballantine LLP (Aug. 20, 2007) ("SSA Letter") (Compl., Ex. 6).  Customs further noted that the "acquisition of shrimp to be used in the processing steps outlined in the ITC investigation . . . does not appear to be materially different than the acquisition of honey to be packed" in the Honey Ruling.  Id.

Although the Honey Ruling does not warrant deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984), cf. United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (Customs' classification ruling letters not entitled to Chevron deference), its "thoroughness, logic, and expertness" offer a persuasive interpretation of § 1675c(b)(4) worthy of deference under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  Mead, 533 U.S. at 220.  The ITC's list of ADPs potentially eligible for CDSOA funds includes certain shrimp processors.  See Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Equador, India, Thailand, and Vietnam,

Inv. Nos. 731-TA-1063-68, USITC Pub. 3748 at 12-14 (Jan. 2005) (Final) ("Injury Determination").  Shrimp is a raw material used in an ADP shrimp processor's operations, and the CDSOA's raw material provision does not distinguish between domestic or imported material.  Customs did not act contrary to law in accepting ADP shrimp processors' expenditures for the acquisition cost of imported shrimp.  See Honey Ruling; SSA Letter.  Accordingly, Plaintiffs cannot prevail on Count 5, which the court must dismiss for failure to state a claim upon which relief can be granted.  USCIT Rule 12(b)(5).

### 2. Double Counting of Qualified Expenditures/Alleged Domestic Production Requirement (Count 4)

In Count 4, Plaintiffs also rely on an incorrect interpretation of the statute, as well as an incorrect interpretation of a specific regulation.  Plaintiffs first complain that Customs unlawfully allows ADP shrimp processors to "double count" qualified expenditures.  (Compl. ¶ 132.)  Plaintiffs next complain that in calculating CDSOA distributions Customs ignores 19 C.F.R. § 159.61(c), which, according to Plaintiffs, requires Customs to distinguish between shrimp farmers, who, according to Plaintiffs, are the only true ADPs, and shrimp processors, who, according to Plaintiffs, do not engage in domestic production activities.  (Id. ¶ 133.)

On the issue of "double counting" qualified expenditures, Plaintiffs claim that Customs unlawfully permits double counting by accepting ADP shrimp processors' purchases of domestic raw shrimp as a qualified expenditure under 19 U.S.C. § 1675c(b)(4)(I).  (Id. ¶ 132.)  According to Plaintiffs, a shrimp farmer's cost of harvesting domestic raw shrimp (fuel, supplies, labor, overhead, etc.) is included within the cost of what an ADP shrimp processor claims as a single raw material expense through its

purchase of shrimp.  (Id.)  Plaintiffs' description of double counting does not reveal a

statutory violation but instead identifies an unremarkable consequence of ADPs operating

at different levels of trade.  For the antidumping orders covering shrimp, the ITC did not

limit its list of ADPs solely to shrimp farmers (and that one level of trade).  Rather, the ITC

also included within that definition certain shrimp processors, who operate at a different

level of trade from the shrimp farmers.  See Injury Determination at 12-14.  Plaintiffs are

simply incorrect that the CDSOA forbids Customs from simultaneously making distributions

to ADP shrimp farmers for harvesting costs and ADP shrimp processors for their shrimp

acquisition costs.  The CDSOA obligates Customs to make distributions to both ADP

shrimp farmers and ADP shrimp processors.  As Customs explained in the Honey Ruling,

the CDSOA does not draw fine distinctions among ADPs or between farmers or

processors.  Each ADP is entitled to claim its qualifying expenditures, and ADP shrimp

processors lawfully may claim as their qualifying expenditures the cost of acquiring

domestic shrimp.

As for Plaintiffs' claim that Customs has unlawfully ignored a purported domestic

production requirement contained in 19 C.F.R. § 159.61(c), Plaintiffs rely on a proposed

regulatory interpretation that Customs has already considered and rejected in the Honey

Ruling.   In 19 C.F.R. § 159.61(c), Customs states, in relevant part, that qualified

"expenditures must be related to the production of the same product that is the subject of

the related order or finding . . . ."  Id.  Plaintiffs argue, as did the petitioners in the Honey

Ruling, that the regulation imposes a purported "domestic production" requirement for

qualifying expenditures.   Not much need be said here other than that Plaintiffs

misunderstand the regulation.  Customs explained in the <u>Honey Ruling</u> that 19 C.F.R.

§ 159.61(c) does not impose a domestic production requirement but was promulgated "to

prevent companies that manufactured multiple products to claim all their expenditures on

facilities and equipment, even if those expenses had little or no connection with the

manufacture of the particular product involved in the antidumping . . . order or finding."

<u>Honey Ruling</u> (<u>citing</u> <u>Distribution of Continued Dumping and Subsidy Offset to Affected</u>

<u>Domestic Producers</u>, 66 Fed. Reg. 48,546 (Dept. Treasury Sept. 21, 2001)).  In other

words, that regulation addresses a particular situation of an ADP that may also farm or

process other products not related to an antidumping duty order covering shrimp.  Under

19 C.F.R. § 159.61(c), the expenses incurred for the other products, as opposed to the

shrimp, are not qualified expenditures for CDSOA distributions.  Customs' interpretation of

the regulation, which is consistent with the regulation and its stated purpose, must be given

controlling weight.   <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461-63 (1997) (agency

interpretation of its own regulation must be given controlling weight unless plainly

erroneous or inconsistent with the regulation); <u>see also</u> <u>White v. United States</u>, 543 F.3d

1330, 1333-34 (Fed. Cir. 2008).  We conclude that 19 C.F.R. § 159.61(c) does not have

the meaning attributed to it by Plaintiffs and applies to a specific set of circumstances not

alleged in Plaintiffs' Complaint.  Plaintiffs therefore fail to state in Count 4 a claim upon

which relief can be granted. USCIT R. 12(b)(5).

### 3. Failure to Enforce Alleged Domestic Production Requirement of 19 C.F.R. § 159.61(c) (Count 3)

Plaintiffs assert that the eleven paragraphs comprising its third count (Compl.

¶¶ 118-28) state a claim that Customs "has failed to promulgate standards or guidelines,

or otherwise enforce 19 C.F.R. § 159.61(c), requiring that qualifying expenditures be related to the production of shrimp."  (Pls.' Resp. To Defs. and Def.-Intervenors' Mot. To Dismiss ("Pls.' Resp.") 20.)  Count 3, therefore, depends on Plaintiffs' proposed regulatory interpretation of 19 C.F.R. § 159.61(c), which, as just explained, misapprehends the regulation and the circumstances to which it applies.  Plaintiffs wish to infer a domestic production requirement within 19 C.F.R. § 159.61(c) that would invite Customs to alter the ITC's definition of the domestic industry.  As explained above, Customs addressed and rejected these arguments persuasively in the <u>Honey Ruling</u>.  The court therefore must dismiss Count 3 for failure to state a claim upon which relief may be granted.  USCIT R. 12(b)(5).

### 4. Antidumping Duties as a Qualifying Expenditure (Count 6)

With respect to Count 6, Plaintiffs complain that Customs unlawfully permitted ADP shrimp processors to claim as a qualified expenditure antidumping duties paid on imported shrimp.  (Compl. ¶¶ 143-47.)  Plaintiffs argue that this violates the remedial purpose of the CDSOA by encouraging the purchase of dumped imported shrimp to the detriment of ADP shrimp farmers.  (<u>Id.</u> ¶¶ 143-45. )  Plaintiffs contend that the statute does not contemplate distributing CDSOA funds to cover the cost of antidumping duties paid on imported shrimp.

Notwithstanding a certain attractiveness to this argument, the CDSOA does not draw any distinctions between different types of raw materials expenses or single out antidumping duties for special treatment, something Congress has done in other contexts. <u>See</u>, <u>e.g.</u>, 19 U.S.C. § 1677h (antidumping duties are not regular customs duties for purposes of duty drawback).  Accordingly, Customs is not violating 19 U.S.C. § 1675c(b)(4)

by accepting ADP shrimp processors' raw materials expenses that potentially may include amounts paid for antidumping duties.  Plaintiffs therefore cannot prevail on Count 6, which the court must dismiss for failure to state a claim upon which relief can be granted.  USCIT R. 12(b)(5).

### B.  Legality of CDSOA Escrow (Count 9)

In Count 9, Plaintiffs complain that Customs lacks the authority to hold a portion of CDSOA funds for fiscal years 2006, 2007, and 2008 in escrow. (Compl. ¶¶ 164-67.) Plaintiffs claim Customs had no legal justification for withholding CDSOA funds from "deserving" ADPs, including Plaintiffs. (Id. ¶ 165.) Specifically, they argue that the decision to escrow is contrary to 19 U.S.C. § 1675c(c), which requires Customs to distribute all CDSOA funds to ADPs no later than 60 days after the close of the preceding fiscal year, and thus should be declared unlawful under 5 U.S.C. § 706(1)-(2).  The result of Customs' decision is, in Plaintiffs' view, not a postponement of the effective date of the distribution of all CDSOA funds, but an affirmative action taken in contravention of the statutory and regulatory scheme.

Section 705 of the APA provides that "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. § 705.  Defendants argue that the decision by Customs to withhold a portion of CDSOA funds pending further judicial review of the constitutionality of the support requirement in the CDSOA—that is, the status of non-ADPs—was "entirely" within Customs' authority under § 705.  (Def.'s Mot. to Dismiss, In Part, Pls.' First Amendment Compl. ("Defs.' Mot.") 31.)  The legislative history of the APA makes clear that an agency,

based on a reasoned explanation, is authorized "to maintain the status quo" and to use its "equitable" authority "to make judicial review effective" by affording parties an adequate judicial remedy.  See Administrative Procedure Act, Pub. L. 1944-46, S. Doc. 248 at 277 (1946) (describing the intent of 5 U.S.C. § 1009(d), the pre-codified version of § 705).  Customs explained that it escrowed those funds because of decisions in SKF USA, Inc. v. United States, 30 CIT 1433, 451 F. Supp. 2d 1355 (2006) ("SKF"),[4] and PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n, 30 CIT 858, 442 F. Supp. 2d 1329 (2006), appeal pending (Fed. Cir. Nos. 08-1526, 1527, 1534, 1555) regarding the constitutionality of the support requirement.  Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 73 Fed. Reg. 31,196-97 (Customs May 30, 2008) ("2008 CDSOA Distribution Notice").  Contrary to Plaintiffs' claims, Customs has discretion pursuant to § 705 to withhold CDSOA funds pending the judicial challenges to the constitutionality of the support requirement.  Accordingly, the court must dismiss Count 9 for failure to state a claim upon which relief can be granted.  USCIT R. 12(b)(5).

### C. Disbursements of Overpayments in the Current Fiscal Year (Count 10)

In Count 10, Plaintiffs allege that Customs "unlawfully refused to distribute" CDSOA funds collected from overpayments in accordance with the pro rata distribution calculation for the fiscal year in which duties were originally collected.  (Compl. ¶¶ 168-172.)  Instead, Customs distributed overpayments in accordance with the pro rata calculation for the fiscal year in which the overpayments were recovered.  (Id.)  Plaintiffs allege that the manner in

---

[4] Subsequent to the oral argument on the motions to dismiss in this action, the U.S. Court of Appeals for the Federal Circuit reversed the decision in SKF.  SKF USA, Inc. v. U.S. Customs and Border Protection, 556 F.3d 1337 (Fed. Cir. 2009).

which Customs distributes the overpayments is contrary to the "statutory mandate" of 19 U.S.C. § 1675c(d)(3).  (Id. ¶¶ 170-72.)  Plaintiffs allege that they are harmed because they receive less in CDSOA funds than they otherwise would, and therefore, Customs' action violates § 706(1) and (2) of the APA.  (Id.)  Plaintiffs request that the court declare this practice "not in accordance with law" and order the agency to redistribute "any CDSOA overpayments recovered in accordance with a corrected distribution formula."  (Id. ¶ 182(j).)

Defendants argue that § 1675c(d)(3) "does not resolve" which fiscal year's calculation governs distribution of the overpayments.  (Defs.' Mot. 32.)  Given the ambiguity in the statute, Defendants argue that Customs' application and interpretation § 1675c(d)(3) are reasonable.  (Id. at 32-33.)

We first look to the statutory language to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); accord Crawfish Processors Alliance v. United States, 477 F.3d 1375, 1379 (Fed. Cir. 2007).  Section 1675c(d)(3) provides:

> The Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications described in paragraph (2).  The distributions shall be made on a pro rata basis based on new and remaining qualifying expenditures.

19 U.S.C. § 1675c(d)(3).  This provision in the statute, which addresses the general distribution occurring each fiscal year, is not necessarily construed to apply to the specific situation in which Customs distributes overpayments that were made in that general distribution.  Furthermore, the statute's use of the term "all funds" may be read either to

apply to the distribution of recovered overpayments, as Plaintiffs advocate, or not, as Customs advocates.

In 2008, Customs rejected the very same argument that Plaintiffs advance here, explaining that when it "recovers overpayments[,] these funds will become available for pro rata distributions in the Fiscal Year in which they are recovered."  Letter from W. David Sims, Branch Chief, U.S. Customs and Border Protection, to John Williams, Southern Shrimp Alliance (Feb. 25, 2008) ("Sims Letter") (Compl., Ex. 8, at 2).  Customs articulated two reasons for its adopted procedure.  First, its approach "furthers the statutory requirement that funds be distributed only to [ADPs] that remain in operation."  Id. Congress limited the receipt of CDSOA funds to ADPs that remain in business.  To receive CDSOA funds, the producer must be an ADP that was (1) a "petitioner or interested party in support" of the antidumping duty or countervailing duty petition; and (2) "remains in operation."  19 U.S.C. § 1675c(b)(1).  If an ADP is no longer in business, it is not eligible to receive CDSOA funds.  See id.  Customs' reasonable approach ensures the fulfillment of this legislative command.  Second, Customs sought to eliminate any requirement that ADPs amend or update their certifications in the years between initial collection of the duties and ultimate recovery of overpayments.  See Sims Letter.  In the court's view, such a policy reasonably promotes agency efficiency with a concomitant reduction in an ADP's burden of submitting paperwork.

Accordingly, the court is persuaded that Customs' interpretation and application of § 1675c(d)(3) governing the distribution of CDSOA overpayments is reasonable.  See Cathedral Candle Co. v. ITC, 400 F.3d 1352, 1366 (Fed. Cir. 2005) (informal agency

interpretations of statutes that are reasonable are persuasive and thus entitled to some degree of deference); see also Skidmore, 323 U.S. at 139-40.  For these reasons, Plaintiffs have not stated a claim upon which relief can be granted.  Therefore, the court must dismiss Count 10 pursuant to USCIT R. 12(b)(5).

### D. Expenditures after October 1, 2007 (Count 11)

In Count 11, Plaintiffs allege that Customs "unlawfully decreed" that CDSOA funds may not be disbursed to ADPs for qualified expenditures occurring after October 1, 2007. (Compl. ¶¶ 173-81.)  Plaintiffs contend that Customs' decision in the 2008 CDSOA Distribution Notice, which was published in the Federal Register, violates the CDSOA Repeal and 19 C.F.R. § 159.61(c).  (Id. ¶¶ 175-76); see also 2008 CDSOA Distribution Notice, 73 Fed. Reg. at 31,196-349.  Plaintiffs allege that so long as goods enter the United States before October 1, 2007, subject to a valid antidumping or countervailing duty order, the duties collected must be distributed to ADPs regardless of when the qualified expenditures occurred.  (Compl. ¶¶ 175-78.)  Plaintiffs submit that Customs' exclusion of qualifying expenditures incurred after October 1, 2007 has no basis in law because the relevant antidumping orders on warmwater shrimp have not been revoked.  (Id. ¶ 178.) Plaintiffs argue that the CDSOA Repeal did nothing to eliminate existing orders and therefore, Customs' determination that "'[t]he [CDSOA] repeal language parallels the termination of an order'" has "no legal justification."  (Id. (quoting 73 Fed. Reg. at 31,198).) Further, Plaintiffs contend that 19 C.F.R. § 159.61(c) permits reimbursement of all eligible qualified expenditures that occur prior to the revocation of an order.  (Id. ¶¶ 179, 176 (emphasis added).)  Finally, Plaintiffs allege that Customs' announced "rule," published in

the <u>Federal Register</u>, sets forth not a mere "interpretation of [the] law," but a new "substantive rule" establishing a "new cut-off date for qualified expenditures." (<u>Id.</u> ¶ 180.) Plaintiffs contend that such a rule is unlawful because Customs failed to provide for notice and comment by interested persons under § 553 of the APA and 19 U.S.C. § 1625. (<u>Id.</u> ¶¶ 180-81.)

Defendants respond that the CDSOA Repeal provided that "[a]ll duties on entries of goods made and filed before October 1, 2007, . . . shall be <u>distributed</u> as if [the CDSOA] had not been repealed." (Defs.' Mot. 33 (<u>quoting</u> CDSOA Repeal (emphasis in original) (internal citations omitted)).) Defendants explain that because the CDSOA's "implementing regulations [19 C.F.R. §§ 159.61-64] did not contemplate [its] repeal," the agency was required to interpret the statutory language to comply with the CDSOA Repeal. (<u>Id.</u>) Defendants assert that Customs interpreted the CDSOA Repeal to harmonize it with 19 C.F.R. § 159.61(c) such that "'[t]he repeal language parallels the termination of an order.'" (<u>Id.</u> 34 (<u>quoting</u> 73 Fed. Reg. at 31,198, <u>citing</u> 19 C.F.R. § 159.61(c) ("[E]xpenditures must be incurred after the issuance, and prior to the termination, of the antidumping duty order or finding or countervailing duty order under which distribution is sought.")).) Finally, Defendants contend that Plaintiffs' preferred statutory construction—permitting ADPs to claim expenses incurred after October 1, 2007—would impermissibly "extend[] the language of the repeal beyond Customs' reasonable interpretation of the statute." (<u>Id.</u>)

The court again begins with the text of the relevant statute.  See Robinson, 519 U.S. at 340; accord Crawfish Processors Alliance, 477 F.3d at 1379.  The CDSOA Repeal provides:

> (a) REPEAL.—Effective upon the date of enactment of this Act, section 754 of the Tariff Act of 1930 (19 U.S.C. 1675c), and the item relating to section 754 in the table of contents of title VII of that Act, are repealed.
>
> (b) DISTRIBUTIONS ON CERTAIN ENTRIES.—All duties on entries of goods made and filed before October 1, 2007, that would, but for subsection (a) of this section, be distributed under section 754 of the Tariff Act of 1930, shall be distributed as if section 754 of the Tariff Act of 1930 had not been repealed by subsection (a).

CDSOA Repeal, 120 Stat. at 154-55.  In the CDSOA Repeal, Congress established October 1, 2007 as the date on and after which entries subject to orders would no longer result in duties available for distribution to ADPs.  Id.  Construing the repeal statute, Customs determined that "[t]he repeal language parallels the termination of an order. Therefore, for duty orders or findings that have not been previously revoked, expenses must be incurred before October 1, 2007, to be eligible for [a CDSOA] offset."  2008 CDSOA Distribution Notice, 73 Fed. Reg. at 31,198.

The statute does not explicitly attribute any other significance to the date of October 1, 2007.  It is arguable that Congress, in expressly providing that all duties on entries of goods made before October 1, 2007 "shall be distributed as if [the CDSOA] had not been repealed," was directing that all provisions of the CDSOA would remain in effect and would govern all determinations affecting the distribution of those duties.  Among the provisions of the CDSOA is § 1675c(d)(3), which states that "[t]he distributions shall be

made on a pro rata basis based on <u>new</u> and remaining qualifying expenditures." 19 U.S.C. § 1675c(d)(3) (emphasis added).   Thus, under this construction, distributions would continue in that manner until such time as no further duties remain to be distributed.

Despite the attractiveness of this possible statutory construction, such a construction would produce an anomalous result.  It would authorize ADPs to continue to claim qualifying expenditures even after the date on which the CDSOA would no longer apply to any entries of merchandise subject to antidumping and countervailing duty orders. Customs apparently recognized this anomaly in analogizing subparagraph (b) of the CDSOA Repeal to "the termination of an order."   <u>2008 CDSOA Distribution Notice</u>, 73 Fed. Reg. at 31,198.  Customs, which is an agency charged with administering the CDSOA and the CDSOA Repeal, construed the CDSOA Repeal to avoid this anomalous result.  Moreover, in directing that duties on entries made prior to October 1, 2007 were to be "distributed" as if the CDSOA had not been repealed, Congress did not express a specific intent that would limit Customs' authority to avoid this anomaly.   The word "distributed" is not entirely without ambiguity in the context in which it is used in the CDSOA Repeal.  Therefore, we conclude that the agency's construction was a reasonable one, although not the only one the agency could have adopted.  <u>See</u> <u>Skidmore</u>, 323 U.S. at 140.

We find no merit in Plaintiffs' claim that the <u>2008 CDSOA Distribution Notice</u> violates 19 C.F.R. § 159.61(c), which provides that "expenditures must be incurred after the issuance, and prior to the termination, of the antidumping duty order or finding or countervailing duty order under which the distribution is sought."  19 C.F.R. § 159.61(c). This regulation, promulgated prior to the CDSOA Repeal, does not address the question

of the date on which an ADP may no longer submit certifications for qualifying expenditures

following the repeal of the statute.

We next consider Plaintiffs' claim that the 2008 CDSOA Distribution Notice is a new

substantive rule subject to the notice and comment provisions of 5 U.S.C. § 553(b)(A) and

19 U.S.C. § 1625.   Section 553(b)(A) provides:

> General notice of proposed rule making shall be published in
> the Federal Register, unless persons subject thereto are
> named and either personally served or otherwise have actual
> notice thereof in accordance with law.
>
> . . . .
>
> [T]his subsection does not apply—(A) to interpretative rules,
> general statements of policy, or rules of agency organization,
> procedure, or practice[.]

5 U.S.C. § 553(b)(A) (emphasis added).   Contrary to Plaintiffs' claims, Customs' 2008

CDSOA Distribution Notice is an interpretation of the statute, and the publication

requirement of § 553 is therefore inapplicable.  See Haas v. Peake, 525 F.3d 1168, 1195

("interpretive rules clarify or explain existing law or regulation and are exempt from notice

and comment under § 553(b)(A)") (internal quotations omitted); see also Am. Mining Cong.

v. Mine Safety & Health Admin., 995 F.2d 1106, 1110 (D.C. Cir. 1993) (distinguishing

between "interpretive" and "legislative" rulings).   Moreover, the notice and comment

requirement of § 1625(c) is equally inapplicable in this instance.  Customs' interpretation

in the 2008 CDSOA Distribution Notice neither "modif[ies] . . . or revoke[s] a prior

interpretive ruling or decision which has been in effect for at least 60 days" nor has "the

effect of modifying the treatment previously accorded by the Customs Service to

substantially identical transactions."  19 U.S.C. § 1625(c).   For the foregoing reasons,

there is no legal basis upon which Plaintiffs may prevail on this claim.  Accordingly the court

must dismiss Count 11 pursuant to USCIT R. 12(b)(5).

### E. Publication of Rulings and Procedures for Reconsideration Requests (Count 8)

Count 8 of Plaintiffs' Complaint alleges unlawful actions by Customs in the

administration of reconsideration proceedings under the CDSOA.  The Customs regulations

provide that "[i]n any case where the distribution is not for the entire certified qualifying

expenditure submitted by an affected domestic producer, and if the affected domestic

producer believes that the reduction was the result of clerical error or mistake by Customs,

it must file a request for reconsideration within 30 calendar days to the address given in the

notification."  19 C.F.R. § 159.64(c)(3).  "After considering the matter, the Customs Service

will notify the party requesting reconsideration of its decision."  Id.  The regulations also

state the consequence of failing to request reconsideration.  See id. § 159.64(f) ("Except

as provided in paragraphs (b)(3) [applying to overpayments to ADPs] and (c)(3) of this

section, any distribution made to an affected domestic producer under this section shall be

final and conclusive on the affected domestic producer.").

Count 8 advances two claims.  Plaintiffs claim that Customs violated 19 U.S.C.

§ 1625 by conducting reconsideration proceedings related to distributions from the shrimp

antidumping duty orders without publishing the rulings resulting from those proceedings.

(Compl. ¶¶ 157, 162-63.)  Plaintiffs further allege that Customs violated the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552(a)(1) by failing to publish procedures, rules, or

guidelines as to the conduct of reconsideration proceedings.  (Id. ¶¶ 157-61, 163.)

### 1. Alleged Violation of 19 U.S.C. § 1625

Plaintiffs allege that Customs conducted CDSOA reconsideration proceedings for fiscal years 2006 and 2007 without publishing the decisions resulting from the agency's reconsideration proceedings, and, in so doing, has violated the obligation imposed by 19 U.S.C. § 1625 to publish "interpretive rulings."  (Id. ¶¶ 157, 162-163.)  Under 19 U.S.C. § 1625(a), Customs is required to publish in the Customs Bulletin, or otherwise make available for public inspection, "any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision . . . with respect to any customs transaction" within 90 days of the issuance of that ruling or decision.  Defendants do not move to dismiss this claim.  Defendant-Intervenors move to dismiss, arguing that this is a claim on which relief cannot be granted.

Plaintiffs' claim is that Customs acted unlawfully in failing to publish reconsideration decisions.  (Id. ¶¶ 157, 162-63, 182(h).)  The court notes that § 1625(a) allows, as an alternative to publication in the Customs Bulletin, that the ruling or decision in question be made "available for public inspection."  Plaintiffs do not expressly state in Count 8 that they object to a failure by Customs to make reconsideration decisions available for public inspection.  They use only the word "publish" in stating their claim.  (Id.)  The threshold issue, therefore, is whether Plaintiffs' claim, in using the term "publish," should be construed more broadly than might be indicated by resort to the common meaning of that term.

The word "publish" has among its definitions to "make generally known: disclose" as well as "to place before the public (as through a mass medium)."  Merriam Webster's Third New International Dictionary 1837 (2002) (emphasis in original).  Thus, the word

"publish" can have a broader meaning than one confined to public disclosure accomplished through a circulated print medium.  Moreover, Plaintiffs allege in their Complaint that they requested that Customs make reconsideration decisions available to the public and that Customs rejected that request.  (Compl. ¶ 100.)  For these reasons, and because Plaintiffs base their claim directly on 19 U.S.C. § 1625, the court considers it appropriate to construe Plaintiffs' use of the word "publish" in their Complaint to mean, in the words of the relevant statutory provision, "publish[] in the Customs Bulletin or . . . otherwise make available . . . for public inspection."  19 U.S.C. § 1625(a).

Plaintiffs' claim presents the question of whether reconsideration decisions are within the class of rulings and decisions that are required to be disclosed by 19 U.S.C. § 1625(a).  This provision does not define the term "interpretive rulings," nor does it define the term "ruling letter" or the term "internal advice memorandum."  Nor does the legislative history of the provision define these terms; that legislative history does, however, make clear that the publication requirement of § 1625(a) is not limited to Customs rulings made with respect to prospective transactions.   S. Rep. No. 95-778, at 22 (1978), as reprinted in 1978 U.S.C.C.A.N. 2211, 2233; H.R. Rep. No. 95-1517, at 13 (1978) (Conf. Rep.), as reprinted in 1978 U.S.C.C.A.N. 2249, 2255-56.  In Part 177 of the Customs regulations ("Part 177"), Customs has promulgated, as "Subpart A—General Ruling Procedure," ("Subpart A") a detailed set of procedures to govern broadly requests for, issuance of, and the legal effect of, Customs' administrative rulings.  19 C.F.R. §§ 177.1-13 (2006) .  Although it does not expressly define the term "interpretive ruling," Subpart A defines a "ruling" as a "written statement issued by the Headquarters Office or the appropriate office of Customs as

provided in this part [i.e., Part 177] that <u>interprets</u> and applies the provisions of the Customs

and related laws to a specific set of facts." Id. § 177.1(d)(1) (emphasis added). Subpart A

addresses specifically the requirement under § 1625(a) to publish, or otherwise disclose,

an "interpretive ruling (including any ruling letter, or internal advice memorandum) or protest

review decision under this chapter with respect to any customs transaction." 19 U.S.C. §

1625(a). In Subpart A, Customs refers to a ruling or decision required to be disclosed by

19 U.S.C. § 1625(a) as an "interpretive decision." Id. § 177.10(a). The Subpart A

regulations state, in § 177.10(a), that "[f]or purposes of this paragraph [i.e., 19 C.F.R.

§ 177.10(a)], an interpretive decision includes any ruling letter, internal advice

memorandum, or protest review decision." Id.

Plaintiffs do not characterize a decision in a CDSOA reconsideration proceeding as

a "protest review decision" within the meaning of 19 U.S.C. § 1625(a) or Subpart A, and

any such characterization would be incorrect because a reconsideration decision is not a

decision that may be protested according to the procedure of 19 U.S.C. § 1514(a).

Therefore, Plaintiffs' claim presents two questions arising under the Subpart A regulations,

the validity of which Plaintiffs do not contest in this action. The first question is whether a

reconsideration decision, issued under 19 C.F.R. § 159.64(c), is a "ruling letter" or an

"internal advice memorandum" within the meanings of those terms as used in § 1625(a)

and Subpart A. The second question is whether a reconsideration decision, if not a ruling

letter or internal advice memorandum, nevertheless could fall within the meaning of the

term "interpretive decision" as that term is used in § 177.10(a). This second question

arises because § 177.10(a), in stating that "an interpretive decision <u>includes</u> any ruling

letter, internal advice memorandum, or protest review decision," does not remove all ambiguity; the provision possibly could be construed to mean that the specifying of ruling letters, internal advice memoranda, and protest review decisions was not meant to be exhaustive.  19 C.F.R. § 177.10(a) (emphasis added).

CDSOA reconsideration decisions plainly are not "ruling letters" for purposes of the Subpart A regulations.  The regulations provide, in several places, that Customs will issue ruling letters in response to ruling requests only with respect to pending transactions, and not with respect to current or completed transactions.  See, e.g., 19 C.F.R. §§ 177.1(a)(1) ("Generally, a ruling may be requested under the provisions of this part only with respect to prospective transactions—that is, transactions which are not already pending before a Customs Service office by reason of arrival, entry, or otherwise"); 177.1(a)(2)(ii) ("a question arising in connection with an entry of merchandise which has been liquidated, or in connection with any other completed Customs transaction, may not be the subject of a ruling request"); 177.7(a) ("no ruling letter will be issued in regard to a completed transaction.").  A request for reconsideration submitted under 19 C.F.R. § 159.64(c)(3) does not constitute a request for a ruling letter.  Even if it were assumed that a CDSOA distribution is a "Customs transaction" for purposes of Subpart A, the distribution could not constitute a "prospective Customs transaction," a term that Subpart A defines as "one that is contemplated or is currently being undertaken and has not resulted in any arrival or the filing of any entry or other document, or in any other act to bring the transaction, or any part of it, under the jurisdiction of any Customs Service office."  Id. § 177.1(d)(3).  A CDSOA determination that is the subject of a reconsideration request is more in the nature of a

"completed" Customs transaction, which "is one which has been acted upon by a Customs Service field office and with respect to which that office has issued a determination which is final in nature, but is (or was) subject to appeal, petition, protest, or other review, as provided in the applicable Customs laws and regulations." Id. §§ 177.1(d)(3), 159.64(f) (providing that, with certain exceptions, "any distribution made to an affected domestic producer under this section shall be final and conclusive on the affected domestic producer.")

Plaintiffs argue that it is inaccurate to characterize the subject of a reconsideration request as focused solely on completed transactions. (Pls.' Resp. 50.) According to Plaintiffs, rulings made by Customs in reconsideration proceedings are "equally applicable to the pro rata share calculated and assigned by the agency to the party that gave rise to the reconsideration request and to all future pro rata shares calculated and assigned to that party." (Id.) Plaintiffs argue that reconsideration proceedings therefore cover both "completed" Customs transactions as well as "pending" Customs transactions. (Id.) This argument is unconvincing. The Subpart A regulations limit ruling requests and ruling letters to prospective transactions and precludes use of the procedure for current or completed transactions. The regulations do not provide that ruling requests may be submitted for transactions which somehow may be construed to be both "prospective" and "completed" in character. Additionally, the CDSOA regulations neither state nor suggest that decisions in one reconsideration proceeding are applicable to all future pro rata shares calculated and assigned to that party. See 19 C.F.R. § 159.64(c)(3).

A CDSOA reconsideration decision does not appear to be an "internal advice memorandum."  An internal advice memorandum is a specific type of issuance that results, under the procedures of 19 C.F.R. § 177.11, when a Customs field office requests advice or guidance from the Customs Headquarters Office with respect to a prospective, current, or completed Customs transaction.  Id. § 177.11(a).  The field office may invoke the internal advice procedure at its own discretion, but must do so when an importer or other person having an interest in the transaction requests that the field office refer the matter to Headquarters.  The reconsideration procedure established by 19 C.F.R. § 159.64(c)(3) does not appear to conform to the internal advice procedure established by 19 C.F.R. § 177.11.  An ADP wishing to pursue a reconsideration request does not do so by submitting to a Customs field office a request that the field office obtain the advice of Customs Headquarters on a particular Customs transaction.  In establishing the reconsideration procedure, § 159.64(c)(3) makes no mention of the internal advice procedure of Subpart A.

Defendant-Intervenors argue that decisions resulting from reconsideration proceedings are not subject to the publication requirements of 19 U.S.C. § 1625 because they are not "rulings."  (Def.-Intervenors American Shrimp Processors Ass'n and It's Members Mot. To Dismiss Pls.' First Am. Compl. ("Def.-Intervs.' Mot.") 23-24.)  According to Defendant-Intervenors, the term "ruling," for purposes of 19 U.S.C. § 1625, is confined to a statement of the agency's interpretation of the law that is issued with respect to a prospective transaction.  (Id.)  Defendant-Intervenors point out that reconsideration decisions are determinations made after the distribution is complete.  (Id. at 24.)  The court

is not convinced by this argument because 19 U.S.C. § 1625(a) is not confined to ruling letters, which by regulation pertain only to prospective transactions.

Even though the court concludes, based on the Subpart A regulations, that reconsideration decisions are not ruling letters and do not appear to be internal advice memoranda, those conclusions do not resolve entirely the question of whether any reconsideration decision could be subject to the public inspection requirement set forth in 19 U.S.C. § 1625(a).  In 19 C.F.R. § 177.10(a), Customs provided that "for purposes of this paragraph, an interpretive decision includes any ruling letter, internal advice memorandum, or protest review decision."  19 C.F.R. § 177.10(a) (emphasis added).  A noted above, the use of the word "includes" is ambiguous and could mean, for example, "includes but is not limited to."  Under 19 C.F.R. § 159.64(c)(3), an ADP may request that Customs issue a reconsideration decision based on a claim of "clerical error or mistake by Customs."  Id. § 159.64(c)(3).  Clerical errors arguably could be addressed in decisions that are in no sense "interpretive" because they do not interpret a provision of law (such as the CDSOA or the regulations thereunder); the same cannot be said for every claim of "mistake."  The court finds nothing in § 177.10 from which it could conclude, definitively, that a reconsideration decision could never, in any circumstances, be "interpretive."  Because § 177.10, although addressing generally the scope of 19 U.S.C. § 1625(a), does not define the term "interpretive decision" with sufficient precision to exclude reconsideration decisions, the court cannot conclude that no such decision could ever come within the meaning of the term "interpretive decision" as used in § 177.10.  The scope provision of Part 177, § 177.0, however, casts some doubt on whether Customs intended that a

reconsideration decision could fall within the scope of Subpart A.  This provision explains that rulings issued in response to requests under Part 177, which includes Subpart A, are to be distinguished from rulings requested under other provisions of the Customs regulations.  Id. § 177.0.  Because Customs addressed reconsideration decisions in Part 159, not Subpart A of Part 177, and in amending the Part 177 regulations made no specific mention of CDSOA reconsideration decisions, it might be argued that Customs made a regulatory determination that such determinations are not "interpretive decisions" of the type addressed by § 177.10.  However, the language of § 177.0 is less than clear on this point.

Also unclear is 19 C.F.R. § 103.4(a)(2) (2006), a provision in the Customs regulations that is related to § 177.10.  Section 177.10 provides, in the last sentence of the paragraph, that "[d]isclosure is governed by 31 CFR part 1, 19 CFR part 103, and 19 CFR 177.8(a)(3)."  The reference to 19 C.F.R. § 177.8(a)(3) pertains solely to ruling letters and, accordingly, is not relevant to the court's consideration of this claim.  Part 1 of Title 31, Code of Federal Regulations, is entitled "Disclosure of Records" and applies to the entire Treasury Department.  It does not provide a basis on which the court may rule on Defendant-Intervenors' motion to dismiss this claim.  Part 103 of Title 19, Code of Federal Regulations, which is entitled "Availability of Information," contains regulations implementing the FOIA with respect to Customs.  As does the FOIA, Part 103 addresses three categories of information—matters that must be published in the Federal Register, matters that must remain available for public inspection and copying, and matters that are subject to disclosure only pursuant to an individual request.  In § 103.4(a)(2), Customs, in

effectuating the FOIA, imposes on itself a requirement to make available for public inspection, or in the alternative publish and offer for sale, "[w]ithin 120 days of issuance, any precedential decision (including any ruling letter, internal advice memorandum, or protest review decision) issued under the Tariff Act of 1930, as amended, with respect to any Customs transaction." Id. § 103.4(a)(2).  This provision, to which pertains a cross-reference to § 177.10, appears to be obsolete and previously to have been in parallel with §177.10 before the latter was amended to effectuate the amendment made to 19 U.S.C. § 1625 by the Customs Modernization Act.  See Administrative Rulings, 67 Fed Reg. 53,483, 53,495-96 (Dep't Treasury Aug. 16, 2002); see also North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 623, 107 Stat. 2057, 2186-87 (1993).  Therefore, the court cannot conclude that an interpretive ruling must be "precedential" in order to be considered by the Customs regulations to be within the scope of the public inspection requirement of 19 U.S.C. § 1625(a).

Because of the lack of clarity in the definition of "interpretive decision" in § 177.10 and a lack of clarity elsewhere in the relevant provisions of the Customs regulations (including a provision that appears to be obsolete), the court cannot conclude with certainty that Customs by regulation has provided that all decisions resulting from CDSOA reconsideration decisions, in any form, are outside the scope of the term "interpretive decision."  The court concludes, therefore, that it is not appropriate to dismiss Plaintiffs' claim arising under 19 U.S.C. § 1625(a).

Another consideration guides the court in denying Defendant-Intervenors' motion to dismiss Plaintiffs' claim under § 1625(a).  At this, the pleading stage of the case, the court

does not rule on, and does not have before it, an administrative record containing any decision that actually has been issued under § 159.64(c)(3). The court cannot rule out entirely the possibility that one or more such decisions, on their face, will bear indicia relevant to the question of whether they are "interpretive."

The Part 103 regulations also contain detailed procedures for withholding from release to the public information that is of a confidential nature. At this stage of the litigation, the court does not, and need not, resolve questions related to the effect that the presence of such information in reconsideration decisions may have on any obligation to make such decisions available for public inspection in redacted form.

For these various reasons, the court declines to dismiss Plaintiffs claim arising under 19 U.S.C. § 1625(a).

### 2. Alleged Violation of FOIA, 5 U.S.C. § 552(a)(1)

Plaintiffs also allege in Count 8 of the Complaint that Customs conducted reconsideration proceedings for CDSOA distributions made in fiscal years 2006 and 2007 in violation of 5 U.S.C. § 552(a)(1). (Compl. ¶¶ 157-161, 163.) Specifically, Plaintiffs allege that Customs violated the FOIA requirement that "[e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . rules of procedure" by failing to publish any procedures, rules, or guidelines for reconsideration proceedings (other than the regulations already in existence). (Id.; Pls.' Resp. 46-47.)

Plaintiffs' claim is based on a misreading of § 552(a)(1). The plain language of 5 U.S.C. § 552(a)(1) requires only the publication of existing procedural rules and does not place an independent obligation on Customs to formulate and then publish such rules.

City of Santa Clara v. Andrus, 572 F.2d 660, 673 (9th Cir. 1978) ("On its face, section 552 requires only the publication of existing rules and not the promulgation of new ones."). Section 552 does not require the promulgation or publication of rules where none exist.

To survive Defendants' and Defendant-Intervenors' motions to dismiss, Plaintiffs' Complaint must make out a plausible claim under 5 U.S.C. § 552(a)(1).  See Iqbal, 490 F.3d at 157-58 (stating that the Supreme Court in Bell Atlantic adopted a "flexible 'plausibility standard'").  To meet this standard, Plaintiffs are obligated to "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Id.  As explained, § 552(a)(1) requires an agency to publish rules of procedure only where such rules of procedure are already in existence; the statute imposes no legal obligation where the agency has formulated no rules of procedure.  Thus, to render a claim under § 552(a)(1) plausible, a pleader must not only make a legal allegation that an agency has violated § 552(a)(1) but also must amplify that legal allegation with a factual allegation that the agency has formulated some rule of procedure that the agency has not published.  Absent such an amplification, a complaint lacks the grounds necessary to plead a violation of § 552(a)(1).  See Bell Atlantic, 127 S. Ct. at 1964-65 (stating that while a complaint attacked by a motion to dismiss "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (brackets, internal quotation marks, and citations omitted)).

Although the Complaint alleges that Customs has failed to publish any rules of procedure (other than those regulations already in existence), nowhere does the Complaint

allege that Customs has formulated such rules or that such rules actually exist. (See Compl. ¶¶ 157-161, 163; see also Pls.' Br. 46-47.) An allegation that Customs has not published any rules of procedure does not, without further factual amplification, suggest a violation of § 552(a)(1). Without grounds to infer that Customs has actually formulated some rule of procedure with respect to reconsideration proceedings, but has failed publish that rule, Plaintiffs' Complaint lacks the factual allegations necessary to render a claim under § 552(a)(1)(C) plausible. See Iqbal, 490 F.3d at 157-58; Bell Atlantic, 127 S. Ct. at 1964-65. The factual allegations made in the Complaint therefore fail to raise Plaintiffs' right to relief under § 552(a)(1) beyond the speculative level, and the court must dismiss Plaintiffs' FOIA claim pursuant to USCIT Rule 12(b)(5). See Bell Atlantic, 127 S. Ct. at 1964-65.

## F. Participation in Reconsideration Proceedings (Count 7)

Plaintiffs allege in Count 7 that Customs has conducted reconsideration proceedings relating to distributions of CDSOA funds for fiscal years 2006 and 2007 while unlawfully prohibiting the participation of Plaintiffs in those proceedings. (Compl. ¶¶ 149, 155.) More specifically, Plaintiffs allege that they have a property interest in the funds held for distribution under the CDSOA by Customs, that this property interest is implicated in reconsideration proceedings insofar as decisions made in such proceedings directly decrease or increase the share of funds to which Plaintiffs are entitled, and that Customs' prohibition on Plaintiffs' participation in, and inspection of, reconsideration proceedings therefore constitutes a deprivation of Plaintiffs' alleged property interest in violation of the

Due Process Clause of the Fifth Amendment to the U.S. Constitution and 5 U.S.C.

§ 706(2)(B).  (Id. ¶¶ 154-55.)  As relief, Plaintiffs request that the court declare that

"Customs' refusal to allow for meaningful third-party beneficiary participation in the

agency's process of considering requests for reconsideration pursuant to 19 C.F.R.

§ 159.64(c)(3) is a violation of Plaintiffs' Due Process rights under the U.S. Constitution."

(Id. ¶ 182(g).)

A claim of unconstitutional deprivation of property under the Fifth Amendment has

three essential elements: (1) the claimant must be deprived of a protected property interest;

(2) the deprivation must be due to some government action; and (3) the deprivation must

be without due process.  Cospito v. Heckler, 742 F.2d 72, 80 (3rd Cir. 1984); see also

Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982) (stating, with respect to

plaintiff's Due Process Clause claim, that "[a]t the outset, then, we are faced with what has

become a familiar two-part inquiry: we must determine whether [plaintiff] was deprived of

a protected interest, and, if so, what process was his due"); see also Deshaney v.

Winnebago County Dept. of Social Services, 489 U.S. 189, 195 (1989) ("The [Due Process]

Clause is phrased as a limitation on the State's power to act . . . [i]t forbids the State itself

to deprive individuals of life, liberty, or property without 'due process of law[.]'").  For the

purposes of addressing Defendants' and Defendant-Intervenors' motions to dismiss

Plaintiffs' Due Process Clause claim, the court assumes, without concluding, that Plaintiffs

"have a property interest in the amounts held for distribution under the CDSOA by

Customs."  (See Compl. ¶ 154.)  Even indulging such an assumption, however, Plaintiffs'

claim must fail.  Reconsideration proceedings conducted pursuant to the plain language

of 19 C.F.R. § 159.64(c)(3) do not deprive Plaintiffs of their alleged property interest.  Nor does the Complaint allege that Customs has, through the application of the § 159.64(c)(3), deprived Plaintiffs of that property interest.  Without the grounds necessary to suggest that Plaintiffs have actually been <u>deprived</u> of their claimed property interest, the court is left to speculate as to whether Plaintiffs have a right to relief under the Due Process Clause, and the court must therefore dismiss Count 7 for failure to state a claim on which relief can be granted.

Contrary to Plaintiffs' legal allegation in the Complaint, Plaintiffs' alleged property interest in the CDSOA funds Customs holds on Plaintiffs' behalf is unaffected by reconsiderations conducted pursuant to 19 C.F.R. § 159.64(c)(3).  (<u>See</u> <u>id.</u> ¶ 155 (stating that Plaintiffs "hav[e] a direct property interest in [reconsideration] proceedings (insofar as these decisions directly decrease or increase the share of funds which Plaintiffs are entitled to)").)  The regulation merely allows an ADP, in a case where "the distribution is not for the entire certified qualifying expenditure submitted" to request reconsideration of the amount distributed if it believes that "the reduction was the result of clerical error or mistake by Customs." 19 C.F.R. § 159.64(c)(3).  In doing so, it provides Customs with the opportunity to <u>avoid unlawfully depriving</u> an ADP of CDSOA funds to which it is entitled on those occasions where Customs has made an incorrect distribution and where that producer brings the mistake to Customs' attention.  To the extent that § 159.64(c)(3), in creating such opportunity, reduces the overall funds available to be distributed to Plaintiffs under the CDSOA, it does not do so by removing funds to which Plaintiffs could claim to have ever been entitled.  It does so by removing CDSOA funds to which Plaintiffs were <u>never</u> entitled;

funds that should have been distributed to the ADP requesting reconsideration in the first place.   Because reconsideration proceedings conducted pursuant to 19 C.F.R. § 159.64(c)(3) do not decrease the amount of CDSOA funds to which Plaintiffs are actually entitled, such reconsiderations do not deprive Plaintiffs of their alleged property interest.

While 19 C.F.R. § 159.64(c)(3) does not, on its face, work to deprive Plaintiffs of their alleged property interest, the court acknowledges that Customs could, in theory, be depriving Plaintiffs of this interest by applying the regulation in violation its plain language, i.e., by using reconsiderations to distribute CDSOA funds to other ADPs for reasons other than mistake or clerical error in a prior distribution.   The Complaint, however, lacks plausible grounds to infer that Customs conducts reconsideration proceedings contrary to the plain language of its own regulation.   Plaintiffs nowhere make a legal allegation that Customs has conducted reconsideration proceedings in violation of 19 C.F.R. § 159.64(c)(3) or a factual allegation that they were deprived of CDSOA funds in such a manner.   Nor would it be reasonable for the court to infer that Customs conducts reconsideration proceedings in violation of its own regulation.

Because reconsideration proceedings conducted pursuant to § 159.64(c)(3) do not deprive Plaintiffs of their alleged property interest, and because Plaintiffs make no allegation that Customs has applied the regulation in violation of its plain language so as to deprive Plaintiffs of that alleged property interest, the court concludes that the Complaint lacks sufficient factual matter with respect to the first essential element of a claim for unconstitutional deprivation of property under the Fifth Amendment to provide the grounds that would entitle Plaintiffs to relief on such a claim.   See Bell Atlantic, 127 S. Ct. at 1964-65

(stating that "while a complaint attacked by a . . . motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do" (brackets, internal quotation marks, and citations omitted)).

Simply put, the Complaint lacks the grounds necessary to suggest that Plaintiffs have

actually been deprived of their claimed property interest.  Accordingly, the court grants

Defendants' and Defendant-Intervenors' motions to dismiss with respect to Plaintiffs' Due

Process Clause claim.  In dismissing Plaintiffs' Due Process Clause claim, the court must

also dismiss Plaintiffs' claim under the 5 U.S.C. § 706(2)(B), as the statutory claim is

contingent on the constitutional claim.  See 5 U.S.C. § 706(2)(B) (requiring the court to hold

unlawful and set aside agency action "contrary to constitutional right, power, privilege, or

immunity").

### G. Alleged Failure to Prescribe Procedures (Count 2)

Plaintiffs assert that the six paragraphs comprising its second count (Compl.

¶¶ 112-117) state a claim that Customs "has failed to calculate and assign pro rata shares

for funds assessed and collected from the six shrimp antidumping duty orders in a manner

consistent with the legal duties conferred on it by the CDSOA statute."  (Pls.' Resp. 20.)

More specifically, Plaintiffs claim that Customs violated 19 U.S.C. § 1675c(c) by failing to

prescribe procedures sufficient and necessary to ensure that CDSOA distributions were

made to applicants for qualified expenditures.  (Compl. ¶ 116.)  Plaintiffs also contend that

Customs' inaction constitutes agency action unlawfully withheld and therefore request

injunctive relief pursuant 5 U.S.C. § 706(1) or, alternatively, pursuant to a writ of mandamus under 28 U.S.C. § 1361.  (Id. ¶ 117.)

Section 1675c(c) of the CDSOA mandates that Customs "shall prescribe procedures for the distribution of the continued dumping or subsidies offset required by this section." 19 U.S.C. § 1675c(c).  Section 1675c(e)(3) also mandates that Customs "shall by regulation prescribe the time and manner in which distribution of the funds . . . shall be made" and that those regulations be "consistent with the requirements of sections 1675c(c) and (d)." 19 U.S.C. § 1675c(e)(3).  Customs, therefore, has an explicit grant of gap filling authority from Congress. See Mead, 533 U.S. at 227.  Customs exercised that authority by promulgating regulations that establish a procedural framework for administering the CDSOA, including procedures for distributions.  See 19 C.F.R. § 159.61-64.  For a claim to be reviewable under 5 U.S.C. § 706(1), it must assert that the agency failed to take discrete action that it is required to take.  Plaintiffs' Complaint does not satisfy this requirement, nor does it satisfy the requirements necessary for the extraordinary remedy of mandamus.

The APA "authorizes suit by [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 61 (2004) ("SUWA") (quoting 5 U.S.C. § 702).  The APA defines "agency action" as "'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" Id. at 62 (quoting 5 U.S.C. § 551(13)) (emphasis in original).  Where "no other statute provides a private right of action, the agency action complained of must be 'final agency

action.'" Id. at 61-62 (quoting 5 U.S.C. § 704).  Section 706 permits a reviewing court to

"compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

The Supreme Court has confirmed that this provision "sometimes" permits litigants to

challenge an agency's inaction, but "only where a plaintiff asserts that an agency failed to

take a discrete action that it is required to take."  SUWA, 542 U.S. at 61 (emphasis in

original).  In SUWA, the Supreme Court explained that the term "failure to act," as it is used

in the APA, is "properly understood as a failure to take an agency action—that is, a failure

to take one of the agency actions (including their equivalents)" defined by the APA. Id. at

62. (emphasis in original).  "The important point," the Court noted, "is that a 'failure to act'

is properly understood to be limited . . . to a discrete action."  Id. at 63. (emphasis in

original).  The Court's "limitation" of § 706(1) "to discrete agency action precludes the kind

of broad programmatic attack" that was rejected by the Court in Lujan v. National Wildlife

Federation, 497 U.S. 871 (1990).  SUWA, 542 U.S. at 64.

        We conclude that Plaintiffs are not challenging a discrete agency action but rather

are alleging a "[g]eneral deficienc[y] in compliance" that "lack[s] the specificity requisite for

agency action."  Id. at 66.  Plaintiffs point to nothing equivalent to a "rule, order, license,

sanction, [or] relief" that Customs has failed to administer.  Id. at 62.  Rather, Plaintiffs

generally attack the sufficiency of the procedures established by Customs pursuant to its

gap filling authority under 19 U.S.C. § 1675c(c).  (Compl. ¶¶ 113, 115, 116.)  This is

underscored by the language of Plaintiffs' claim, which states that Customs has failed to

"prescribe[] procedures sufficient and necessary to ensure that CDSOA distributions were

made to applicants for qualifying expenditures . . . ." (Id. ¶ 116 (emphasis added).)  Indeed,

Plaintiffs are not really challenging agency inaction at all because Customs has acted to prescribe procedures for CDSOA distributions.  See 19 C.F.R. §§ 159.61-64; 19 U.S.C. § 1675c(c), (e)(3).  Plaintiffs simply object to the efficacy of the process Customs has adopted.  See Sierra Club v. Peterson, 228 F.3d 559, 568 (5th Cir.2000) (en banc) (noting that the agency "has been acting, but the [Plaintiffs] simply do not believe its actions have complied" with the relevant statute); Public Citizen v. Nuclear Regulatory Comm'n, 845 F.2d 1105, 1108 (D.C. Cir.1988) ("The agency has acted. . . . Petitioners just do not like what [it] did.").

Furthermore, the relief that Plaintiffs are asking the court to compel is not legally required by the CDSOA.  A court's authority to act under the APA is limited to directing the agency to "perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." SUWA, 542 U.S. at 64 (emphasis in original) (quotations omitted).  This "limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." Id. at 65 (emphasis in original).  The Supreme Court explained that this limitation was carried forward from the use of writs of mandamus under 28 U.S.C. § 1361, prior to the passage of the APA, and that the "mandamus remedy was normally limited to enforcement of a specific unequivocal command, the ordering of a precise, definite act . . . about which [an official] had no discretion whatever." Id. at 63 (quotations omitted).

In this case, the CDSOA imposes on Customs a general duty to prescribe procedures (and regulations) for CDSOA distributions but leaves the details of that process to the agency's discretion.  Since Congress has left these matters to the agency's

discretion, the court may not supplant the agency's authority by mandating supplementary requirements for administering the CDSOA.  Because Plaintiffs do not allege that Customs has failed to take a discrete action that it is legally required to take, Plaintiffs' claim under the APA is unreviewable under 5 U.S.C. § 706(1).  It also follows that Plaintiffs' claim for a writ of mandamus must similarly fail because Plaintiffs have failed to identify a "clear, nondiscretionary duty" that Customs owes Plaintiffs under the CDSOA.  See Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380 (2004) (listing three requirements for writ of mandamus: (1) defendant must owe plaintiff a clear, nondiscretionary duty; (2) plaintiff must have no adequate alternative remedies; and (3) the issuing court must be satisfied that the writ is appropriate under the circumstances).  The court therefore must dismiss Count 2 of Plaintiffs' Complaint.[5]

### H. Alleged Failure to Administer the CDSOA Program Lawfully (Count 1)

In Count 1, Plaintiffs allege that Customs has "fail[ed] to administer the CDSOA program so as to distribute funds derived from duties collected . . . for the benefit of affected domestic producers based on incurred qualifying expenditures related to domestic production." (Compl. ¶ 111.)  Plaintiffs ask the court to "hold and declare unlawful Customs' administration of CDSOA funds for FY 2006, FY 2007[,] and FY 2008." (Id. ¶ 182(a).)  This claim appears to seek "wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic

---

[5]There is a split of authority among the circuits as to whether APA claims of the type at issue here must be dismissed pursuant to the federal rule of civil procedure equivalents of USCIT Rule 12(b)(1) or USCIT Rule 12(b)(5) (FRCP Rule 12(b)(6)).  See Sharkey v. Quarantillo, 541 F.3d 75, 87-88 & n.10 (2d Cir. 2008).  Regardless of the approach, the analysis of Plaintiffs' APA claim in Count 2 remains the same.

improvements are normally made." SUWA, 542 U.S. at 64 (quoting Lujan, 497 U.S. at 891).

To the extent that Count 1 of Plaintiffs' Complaint challenges the wholesale administration

of the CDSOA by Customs, such a claim is not reviewable under the APA. See id.

Apart from the broad programmatic attack on Customs' administration of the

CDSOA, Plaintiffs assert that the nine paragraphs comprising its first count (Compl. ¶¶ 103-

11) state a claim that Customs "has failed to calculate and assign pro rata shares for funds

assessed and collected from the six shrimp antidumping duty orders for the benefit of

affected domestic producers based on incurred qualifying expenditures." (Pls.' Resp. 20.)

Plaintiffs appear to be claiming, in essence, that Customs' administration of the program

for each of the three fiscal years violates the CDSOA by calculating and assigning shares

other than for the benefit of ADPs based on incurred qualifying expenditures. (Compl. ¶

104.) Much of Plaintiffs' Count 1 depends on claimed violations found in Plaintiffs' other

counts. For example, in explaining why Customs' pro rata share determinations were

unlawful, Plaintiffs cite Count 9, in which they allege that Customs unlawfully withheld

money for non-ADPs, rather than distributing it to ADPs as required by 19 U.S.C.

§ 1675c(a). (Compare Pls.' Resp. 18, with Compl. ¶¶ 164-67.) We have not found any

viable claims in Plaintiffs' other counts, with the exception of Plaintiffs' claim arising under

19 U.S.C. § 1625 (Count 8). There appears, however, to be one alleged basis for the

unlawfulness of the pro rata share determinations not covered by the balance of Plaintiffs'

Complaint: that Customs knew or should have known that deceptive certifications for

CDSOA funds were submitted despite the "absurdity, impropriety, or obvious error"

contained in those certifications.  Basically, Plaintiffs claim that Customs should have done

more to identify and reject suspicious certifications for shrimp-related CDSOA distributions,

resulting in higher distributions for Plaintiffs.  (Id. ¶¶ 75-76, 107-110.)        Defendants and

Defendant-Intervenors characterize Plaintiffs' allegation about suspicious certifications as

"a challenge to Customs' individual enforcement decisions regarding each CDSOA

certification submitted under the shrimp orders," and that such enforcement decisions and

any corresponding agency inaction are not subject to judicial review under the APA.  (Def.-

Intervs.' Mot. 15; Defs.' Mot. 18-21; see also 5 U.S.C. § 701(a)(2).)  Heckler v. Chaney, 470

U.S. 821 (1985), explains that an agency's decision not to institute enforcement

proceedings is presumptively unreviewable under the APA:

> First, an agency decision not to enforce often involves a
> complicated balancing of a number of factors which are
> peculiarly within its expertise. Thus, the agency must not only
> assess whether a violation has occurred, but whether agency
> resources are best spent on this violation or another, whether
> the agency is likely to succeed if it acts, whether the particular
> enforcement action requested best fits the agency's overall
> policies, and, indeed, whether the agency has enough
> resources to undertake the action at all. An agency generally
> cannot act against each technical violation of the statute it is
> charged with enforcing. The agency is far better equipped than
> the courts to deal with the many variables involved in the
> proper ordering of its priorities. Similar concerns animate the
> principles of administrative law that courts generally will defer
> to an agency's construction of the statute it is charged with
> implementing, and to the procedures it adopts for implementing
> that statute.

Heckler, 470 U.S. at 831-32.

Heckler's applicability to Plaintiffs' claim is confirmed by Plaintiffs' request for

relief—a court ordered injunction directing Customs to develop standards and procedures

for "systematically verifying CDSOA certifications" (Compl. ¶ 182(l)).  The systematic

verification of CDSOA certifications, however, is a task not required by the CDSOA, and one that "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." Id.  For the shrimp orders alone, Customs receives approximately 9000 certifications each fiscal year.  Customs is "far better equipped" than the courts to determine whether, and to what extent, verification is required for CDSOA certifications, and  "to deal with the many variables involved in the proper ordering of [the agency's] priorities."  Heckler, 470 U.S. at 832.  Therefore, to the extent that Count 1 asserts a claim that Customs' failed to verify possibly inflated certifications for CDSOA funds from the six shrimp antidumping orders, such claim is unreviewable under the APA and is dismissed pursuant to USCIT R. 12(b)(1).  5 U.S.C. § 701(a)(2); see also Heckler, 470 U.S. at 831-32.

### III. Conclusion

Based on the discussion set forth above, the court is entering an Order dismissing from Plaintiffs' Complaint all claims except the claim arising under 19 U.S.C. § 1625(a) that is stated in Count 8 of the Complaint.

### ORDER

Upon consideration of Defendants' motion to dismiss and Defendant-Intervenors' motion to dismiss, and all other papers and proceedings in this case, for the foregoing reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss is granted; it is further

**ORDERED** that Defendant-Intervenors' motion to dismiss is granted in part and denied in part; and it is further

**ORDERED** that the claims in Plaintiffs' Complaint are dismissed with the exception

of Plaintiff's claim arising under 19 U.S.C. § 1625(a) in Count 8.

__/s/ Gregory W. Carman___
Judge Gregory W. Carman


__/s/ Timothy C. Stanceu___
Judge Timothy C. Stanceu


__/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: May 15, 2009
        New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                              Deputy Clerk